QUINN EMANUEL URQUHART & SULLIVAN, LLP
Sam S. Stake (Cal. Bar No. 257916)
samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600

QUINN EMANUEL URQUHART & SULLIVAN, LLP
David LeRay (*pro hac vice* forthcoming)
davidleray@quinnemanuel.com
Scott Hartman (*pro hac vice* forthcoming)
scotthartman@quinnemanuel.com
Steig D. Olson (*pro hac vice* forthcoming)
steigolson@quinnemanuel.com
295 Fifth Avenue, 9th Floor
New York, New York 10016
Telephone:     (212) 849-7000

*Attorneys for Rocket Resume, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCKET RESUME, INC., <br><br> Plaintiff, <br><br> v. <br><br> BOLD LIMITED, BOLD LLC, BOLD HOLDINGS LLC, DOUG JACKSON, JAMIE FREUNDLICH and HEATHER WILLIAMS, <br><br> Defendants. | CASE NO. <br><br> **CIVIL COMPLAINT** <br><br> JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................1

THE PARTIES ...................................................................................................................8

    A.    Plaintiff—Rocket Resume, Inc. ...........................................................8

    B.    Defendants............................................................................................9

JURISDICTION AND VENUE.......................................................................................10

INTRADISTRICT ASSIGNMENT .................................................................................11

FACTUAL ALLEGATIONS ...........................................................................................11

    A.    The Online Resume-Building Platforms Market.................................11

        1.    The Online Resume-Building Platforms Market Is Distinct........................11

        2.    Online Resume-Building Platforms Are Not Reasonably Interchangeable With Other Tools ..............................................................14

        3.    The Relevant Market Satisfies the Hypothetical Monopolist Test .............17

        4.    The Role of Google Search in the Relevant Market ...................................18

    B.    BOLD is a Monopolist in the Market For Online Resume-Building Platforms ..................................................................................................20

    C.    Defendants Maintain BOLD's Monopoly Through An Overarching Anticompetitive Course of Conduct.......................................................21

        1.    Defendants Construct a Sprawling Web of Sham Entities To Monopolize the Market ............................................................................22

            (a)    Resume-Now: A Case Study.........................................................25

            (b)    BOLD Deceives the Industry ........................................................27

        2.    Auction Manipulation and Predatory Over-Bidding...................................30

            (a)    Google's Policies and BOLD's Evasion ........................................30

            (b)    BOLD's Bidding Strategy to Foreclose Competition .....................33

        3.    De Facto Exclusive Dealing Through Foreclosure of the Critical Distribution Channel ...............................................................................38

        4.    BOLD Abuses Litigation As a Weapon to Expand Its Complex Web of Sham Entities .....................................................................................39

        5.    BOLD Attempts to Neutralize Rocket Resume .........................................42

-i-

D.      BOLD Has Caused Antitrust Injury ...............................................................46

      1.      BOLD's Anticompetitive Behavior Has Harmed Customers, Google, and Competitors ...................................................................................46

      2.      Interstate Trade and Commerce ..................................................................49

CAUSES OF ACTION ...........................................................................................................49

    COUNT I   Sherman Act Section 2 – Monopolization (15 U.S.C. § 2)...............................49

    COUNT II   Sherman Act Section 2 – Attempted Monopolization ....................................50

    COUNT III   Sherman Act Section 1 – Conspiracy to Restrain Trade ..............................51

    COUNT IV   Unfair Competition – California Business & Professions Code § 17200 *et seq.*..................................................................................................................52

PRAYER FOR RELIEF ...........................................................................................................53

DEMAND FOR JURY TRIAL.................................................................................................54

**INTRODUCTION**

1. Rocket Resume, Inc. ("Rocket Resume"), by its undersigned counsel, brings this complaint against BOLD Limited ("BOLD"), BOLD LLC, BOLD Holdings LLC, Chief Executive Officers Doug Jackson and Jamie Freundlich, and Heather Williams for monopolization, attempted monopolization, conspiracy, and unfair competition.

2. Defendants have engaged in a widespread scheme of deception and anticompetitive conduct affecting over $750 million worth of commerce annually in the Online Resume-Building industry and millions of jobseekers in the United States. At the center of this scheme is Defendants' complex web of sham corporate entities around the globe, with fictitious headquarters in places as diverse as Switzerland, Bermuda, and Puerto Rico. In reality, these entities operate under shared ownership and oversight, and with shared purpose—enriching BOLD's owners at the expense of customers.

3. As a result of Defendants' scheme, when jobseekers search for resume-building tools online, they are presented with a large, yet illusory, number of "options"—nearly all of which are in fact BOLD's low-quality offerings. As detailed below, thereafter, BOLD's websites entice customers with "free" resume-builders. After spending significant time and energy to build their resume, customers have to pay a nominal subscription fee to download the final formatted resume. Then BOLD entities charge customers *10-20x* this fee every four weeks, while making this charge extraordinarily hard to cancel. The result is that customers and jobseekers are systematically ripped off by what appears to be a large range of online resume-building services, when in fact this is BOLD's doing alone.

4. While customers and jobseekers are victims of this scheme, Defendants' scheme also harms BOLD's competitors by destroying competition in the Online Resume-Building Market (as defined below). A rival like Rocket Resume trying to compete the right way, by offering high-quality products at competitive prices, cannot compete against BOLD's complex web of sham entities. BOLD and its massive portfolio of fraudulent brands overwhelm search engines, review websites, and the other electronic means through which customers might locate an online resume-builder. BOLD also publishes fake reviews of its competitors, presented as neutral testimonials, as

-1-

further detailed below.  These behaviors destroy competition and damage the economy.  Rivals like Rocket Resume are buried from view, and Defendants maintain BOLD's monopoly by duping job-seeking customers, search platforms, and regulators through the illusion of competition.

5.    BOLD exercises varying degrees of concealment over its web of brands.  The only brands BOLD discloses owning on its own website are www.myperfectresume.com ("My Perfect Resume"), www.monster.com ("Monster"), www.careerbuilder.com ("CareerBuilder"), www.zety.com ("Zety"), and www.livecareer.com ("LiveCareer").[1]  Yet when jobseekers go to the webpages for these entities directly, BOLD's ownership is largely concealed.  For instance, instead of providing transparency that BOLD owns these entities, BOLD lists "MCB Bermuda Ltd" as owning Monster and CareerBuilder and "Works Limited" as owning Zety.

6.    Pretending that BOLD is five separate companies, when it is in fact one, is bad enough.  But in reality, there are many other BOLD entities that BOLD holds out as standalone with their own websites.  In addition to the entities listed above, BOLD owns www.resumegenius.com ("Resume Genius"), www.resumecompanion.com ("Resume Companion"), www.resume-now.com ("Resume-Now"), www.resumehelp.com ("Resume Help"), www.resumebuilder.com ("Resume Builder"), www.resumelab.com ("Resume Lab"), www.greatsampleresume.com ("Great Sample Resume"), www.buildurcv.com ("BuildUrCV"), www.hloom.com ("Hloom"), www.jobhero.com ("Job Hero"), www.zenresume.com ("Zen Resume", which now directs to Resume Lab), and many more.

7.    These sham entities offer functionally identical services, target identical customers, charge virtually identical prices, draw from identical content databases, and operate under unified management control, often using the same technology.  The only differences are cosmetic, and are just enough to fool customers: color schemes, logos, and domain names.  This provides the illusion of choice and competition—customers, Google, and regulators are led to believe the Market is competitive and fair, but it is in fact rigged in Defendants' favor.

---

[1]  https://www.bold.com/about/.

8.      Altogether, through its various sham entities, BOLD controls **_over 80%_** of the online resume Market, with very few independent rivals left.  Rocket Resume is one of the few independent competitors that remains, with a market share in the single digits.   Left unchecked, BOLD's anticompetitive tactics have succeeded and will continue to succeed, and the Market will be left almost entirely in its hands, depriving millions of customers of price competition and meaningful choice.

9.      BOLD's anticompetitive scheme has several related prongs.  **_First_**, BOLD uses its vast web of sham entities to utterly dominate advertising positions in Google search[2] results, artificially crowding out competitors like Rocket Resume from this vital distribution channel.  There are usually only three to four sponsored Google search positions available; BOLD uses its fictitious brands to typically occupy them all, or almost all of them.  As a result, when jobseekers search Google using industry-standard search terms and keywords such as "resume builder," they may see My Perfect Resume, Resume Genius, and Resume Nerd occupying the top sponsored advertising positions and assume they can then select among competitive alternatives in a well-functioning market.  Indeed, these three brands alone occupy—based on Rocket Resume internal analyses— approximately 2.5 of the top advertising slots per search in the critical Google search results when a user runs typical keyword searches for online resume-builders.  And 90% of the time, the precious top spot in the critical distribution channel that is Google search goes to BOLD.

10.     The following screenshot (which was generated from a search for "free resume builder") shows how BOLD's scheme operates to crowd out competition, while giving the fictitious appearance of choice (with "BOLD" added in red on the left):

---

[2]   This Complaint focuses on Google Search, but BOLD's anticompetitive conduct persists in other search channels, such as Microsoft Bing.

-3-



11.     The websites in the screenshot—My Perfect Resume, Resume-Now, Resume Genius, and Resume Builder occupy all of the top Google search results.  However, they are not, in fact, competitive alternatives.  All four of these brands, along with many others, are BOLD-controlled entities and offer remarkably similar products.  Defendants fictitiously present them as different competitors while knowing full well that they are not.  They draw from the same content database, are coordinated by the same management team, and use the same misleading pricing practices.  By bidding on behalf of multiple sham entities, BOLD is able to rig advertisement auctions and occupy the lion's share of all paid advertising results, relegating rivals to the crumbs of this critical channel to reach customers.

12.     BOLD's conduct violates Google's "Unfair Advantage" policy, which prohibits companies like BOLD from "[u]sing the Google Network to gain an unfair traffic advantage over other participants in the auction."  Google takes, and enforces, its advertising policy seriously.  Enforcement actions include suspending the accounts of those who violate its policy and issuing strikes and penalties against those accounts and users.  But, when BOLD is caught in the act (and it

-4-

has been caught in the act), BOLD just starts using another sham entity or slightly changes the domain address name of one of its many supposedly different brands. For instance, in 2023, BOLD attempted to evade detection by switching the domain of www.resumenrd.com to www.resumenrd.ai while making no substantive changes to the product or website itself. This is clear evidence of BOLD's consciousness of guilt in blatantly defrauding Google and its users.

13. ***Second***, BOLD also maintains its monopoly by coordinating its bids across its brands to pay inflated prices for Google search advertising positions—prices that rivals like Rocket Resume cannot match without operating at a loss. Among Google's sponsored ad positions, the top spot is indisputably the most valuable, capturing almost 50% of all clicks, followed by the second position, and so on. Because BOLD secretly controls multiple sham entities, it can simultaneously occupy the top three advertising positions on Google search results and spread its costs to achieve a blended average cost per click far below what any single competitor must pay for the top spot alone. Rocket Resume then is left between the proverbial rock and a hard place. If it submits to BOLD's dominance and relegates its bids to lower positions, Rocket Resume will never capture enough customers to be viable. On the other hand, to compete for position 1 by bidding full price without BOLD's ability to capture customers through disguised zombie entities, Rocket Resume would be forced to operate at a loss.

14. BOLD's predatory bidding conduct intentionally raises rivals' costs to unsustainable levels, while also allowing BOLD to take constructive control over Google search and deprive rivals of meaningful access to the critical distribution channel in the Online Resume-Building Market.

15. By using multiple sham entities to bid, and by being willing to flout Google's policies, BOLD can afford to operate at a loss to capture any individual customer because the aggregate result of its overbidding is profitable. BOLD can afford to pay prices that competitors cannot because BOLD captures revenue regardless of which brand the customer selects. If BOLD manipulates the auction by bidding on behalf of three, four, or even more "separate" brands for the top advertising positions, BOLD can win the vast majority of advertising positions and capture customers regardless of which advertising slot the customer utilizes. Whether the customer clicks on My Perfect Resume, Resume Genius, or Resume Nerd, BOLD receives the revenue.

16.    Legitimate competitors like Rocket Resume face a different economic reality.  To compete for a top position, Rocket Resume must pay an excessively high price to beat BOLD's inflated auction bids.  But unlike BOLD, Rocket Resume cannot spread this cost across multiple sham entities.  The result is that Rocket Resume's customer acquisition costs become economically irrational, and it becomes impossible to compete.

17.    ***Third***, in furtherance of its scheme to dominate the Market, BOLD sues, with anticompetitive intent, rivals who attempt to remain in the market by asserting violations of its intellectual property.  These lawsuits cause rivals—typically smaller startups—to divert crucial resources to legal defense.  And eventually, in each case except Rocket Resume, those rivals either cave to BOLD's anticompetitive demands and join BOLD's web of zombie entities or exit the market entirely.

18.    The pattern is consistent: whenever BOLD sees a competitor has gained any market traction, BOLD threatens to file a copyright infringement lawsuit alleging copying of BOLD's "Text Tuner Content" database or website elements.  BOLD knows that these threatened lawsuits can impose enormous litigation costs on smaller competitors while BOLD—with annual revenues estimated at $628 million—can easily absorb legal expenses as a cost of monopoly maintenance.  For instance, BOLD entities have brought lawsuits against companies in control of Resume Genius, Resume Companion, and Resume Direct.  All of these companies are now either defunct as competitors or absorbed into BOLD's portfolio, thus highlighting the effectiveness of BOLD's litigation weaponization.

19.    BOLD deployed the same aggressive, anticompetitive copyright litigation strategy against Rocket Resume in Case No. 5:22-cv-01045-BLF-SVK before this Court.  Rocket Resume was only able to survive the attack because its founder, Stephen Zimmerman, is a software engineer himself who was willing to work alone and go without pay for several years—an asset few other resume-building companies have.  Rocket Resume then defeated BOLD at summary judgment on all substantive claims.  That win, though, was still a loss because defending the baseless litigation imposed a crippling burden on Rocket Resume's business, exactly as BOLD intended.

20. Rocket Resume has been injured by BOLD's anticompetitive conduct since its inception. Rocket Resume has required extraordinary measures in order to grow despite BOLD's oppressive double serving, chokehold over the critical distribution channel, predatory overbidding, and pretextual litigation. It has only survived because Mr. Zimmerman invested all of his savings and sweat equity to build the company from the ground up and was willing to operate at negative margins to relentlessly stay afloat.

21. Yet BOLD's anticompetitive behavior has not ceased with respect to Rocket Resume—it has escalated. On March 25, 2026, BOLD threatened Rocket Resume again, claiming that Rocket Resume should agree to not even bid on ads containing brand names associated with BOLD entities—brand names that BOLD still refuses to identify, rendering any sort of compliance impossible. This demand is particularly egregious because competitive keyword bidding is a standard, well-established industry practice in which BOLD itself regularly engages through its multiple sham entities. Regulatory agencies and courts have expressly recognized competitive keyword bidding as lawful and procompetitive behavior. BOLD's attempt to prohibit Rocket Resume from engaging in the same practices that BOLD routinely employs through its many sham entities is the latest phase of a deliberate, ongoing campaign to exclude Rocket Resume from the Market.

22. BOLD has not earned its market dominance on the merits, but rather through the anticompetitive scheme and course of conduct described herein. And the problem is self-reinforcing—the more BOLD's behavior is left unchecked, the more brands it acquires, the more deception it perpetuates, and the greater its capacity to intensify the very conduct that forecloses rivals from the Market. If it was challenging to compete years ago for competitors like Rocket Resume, it has only grown more difficult since—and will continue to worsen absent judicial intervention. Rocket Resume accordingly brings its claims under the Sherman Act and the California Unfair Competition Act to restore a competitive Market for Online Resume-Building Platforms.

# THE PARTIES

## A.     PLAINTIFF—ROCKET RESUME, INC.

23.     Founded in March 2019 by entrepreneur Stephen Zimmerman, Plaintiff **Rocket Resume, Inc**. ("Rocket Resume") entered the Online Resume-Building Market with an innovative platform designed to democratize access to professional quality resume creation.  Rocket Resume is a corporation organized under the laws of Delaware with a registered business address of 6469 Almaden Expy., Ste. 80, #560, San Jose, CA 95120.

24.     Rocket Resume differentiates itself through its intellectual property, user-centered design, technological innovation, customer support features, online subscription cancelling, unlimited resume-creation, lifetime limitless cloud storage, and the ability to tailor templates to many job categories.  The platform offers a content suggestion system that provides jobseekers with tailored recommendations for nearly every job title in the market, while its intuitive interface allows users to create polished resumes optimized for Applicant Tracking Systems—the AI-powered software that nearly all Fortune 500 companies use to screen applications—in as little as ten minutes.

25.     Unlike competitors that rely primarily on generic templates, Rocket Resume has developed proprietary technology that offers real-time previews, smart formatting automation, and a database of over 20 million pre-written content suggestions spanning tens of thousands of job titles.  The company has invested heavily in ensuring that resumes created on its platform can successfully navigate and clear Applicant Tracking Systems while maintaining visual appeal for human reviewers.

26.     Rocket Resume's market reception validates its innovative approach.  The company has achieved exceptional customer satisfaction ratings, earning 4.9 out of 5 stars on Google Reviews (based on over 3,900 reviews).  Customers consistently praise Rocket Resume's ease of use, responsive customer service, and the speed with which they could create professional resumes.  Reviews frequently highlight how Rocket Resume's guided process removes the intimidation factor from resume creation, with jobseekers noting that the platform's prompts and suggestions help them articulate their accomplishments more effectively than they could have done independently.

-8-

27. The company's financial trajectory in its initial years reflected its product-market fit and competitive strength. Rocket Resume grew from $5,000 in revenue in its founding year (2019) to $454,000 (2020), $4.2 million (2021), $9.83 million (2022), and $11.62 million (2023)—demonstrating year-over-year growth rates exceeding 100% in multiple periods. By 2022, Rocket Resume had facilitated the creation of approximately 1.5 million resumes.

28. By 2023, Rocket Resume had captured approximately 9% of the Market—making it BOLD's largest and most significant competitor. Rocket Resume achieved this market position through legitimate competitive advantages: superior user experience, responsive customer support, continuous platform improvements, and marketing efficiency that maximized return on advertising spend.

29. Rocket Resume represented a genuine competitive threat to BOLD's monopoly precisely because of its vigorous competition on the merits. The company's product quality, customer satisfaction, and operational efficiency demonstrated that smaller competitors could succeed in the Market if allowed to compete fairly.

30. Rocket Resume's trajectory from a startup to a company with a valuation exceeding $100 million in under five years showed the Market's capacity for dynamic competition and innovation when not artificially constrained by exclusionary conduct. Rocket Resume's early success was remarkable given that it was suppressed by BOLD's general monopolization strategy in the Market, which required massive marketing spend just to attempt to level the playing field. Rocket Resume would triple overnight, were BOLD to cease its monopolistic strategy of displaying two Ads in the same search results, or "double-serving"—and, in reality, most cases are actually triple or even "quadruple-serving." This competitive threat—the prospect that Rocket Resume would continue gaining market share through superior service and word-of-mouth growth—is precisely what triggered BOLD to target Rocket Resume specifically, and at the time that BOLD did.

**B.** **DEFENDANTS**

31. BOLD operates through a deliberately opaque corporate structure designed to obscure common ownership of a wide swath of sham entities and evade both oversight by regulatory

agencies and enforcement from Google.  The company maintains dual entities—Defendant BOLD Limited, organized under the laws of Bermuda, and Defendant BOLD LLC (described as the parent company of BOLD Limited in prior court filings), organized under the laws of Puerto Rico—with headquarters located in Guaynabo, Puerto Rico, and additional operations in Warsaw, Poland, Noida, India, San Francisco, California, and potentially other locations.

32.     BOLD's multi-jurisdictional structure has allowed it to operate with minimal transparency and maintain a complex web of dozens of sham entities around the globe that it presents to the public as independent competitors.

33.     Defendant BOLD Holdings LLC has been described as the parent company of BOLD LLC in prior court filings.

34.     Defendant Doug Jackson is Co-Chief Executive Officer of BOLD and a resident of Puerto Rico.  As late as January 2026, Jackson maintained a residence in Santa Rosa, California.

35.     Defendant Jamie Freundlich is Co-Chief Executive Officer of BOLD and a resident of Puerto Rico.  Freundlich still maintains a residence in New York City.

36.     Defendant Heather Williams is the former Chief Financial Officer of BOLD and a resident of Boca Raton, Florida.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over Plaintiff's federal claims under the Clayton Antitrust Act, 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, and 1337.  The Court has supplemental jurisdiction over Plaintiff's California state law claim pursuant to 28 U.S.C. § 1367.

38.     This Court has personal jurisdiction over BOLD because BOLD maintains a significant footprint in the San Francisco Bay Area, including its office at 100 Montgomery Street #1000, San Francisco, CA 94104, and Los Angeles.  BOLD has engaged in sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both United States and California law such that the exercise of jurisdiction over BOLD would comport with due process.  BOLD transacts substantial business in this District and in the State of California, including by operating Online Resume-Building Platforms marketed to and used by

millions of California customers.  BOLD has also previously invoked the jurisdiction of this Court, having filed suit against Rocket Resume in February 2022.

39.     This Court has personal jurisdiction over Doug Jackson, Jamie Freundlich, and Heather Williams because they have engaged in sufficient minimum contacts with the United States and California, and have purposefully availed themselves of the benefits and protections of both United States and California law by directing a scheme that targets both California jobseekers and California companies like Rocket Resume, such that the exercise of jurisdiction over them would comport with due process.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because BOLD may be found in or transacts business in this District.

## INTRADISTRICT ASSIGNMENT

41.     This action is properly assigned to the San Jose Division of this District, pursuant to Civil Local Rule 3-2(c) and (e), because Rocket Resume is headquartered, and a substantial part of the events or omissions that give rise to the claim occurred, in Santa Clara County, which is served by the San Jose Division.

## FACTUAL ALLEGATIONS

**A.     THE ONLINE RESUME-BUILDING PLATFORMS MARKET**

**1.     The Online Resume-Building Platforms Market Is Distinct**

42.     BOLD dominates the market for Online Resume-Building Platforms (the "Market"), which is the relevant market for this case, controlling over 80% of it.  Because of BOLD's anticompetitive scheme, this Market has the appearance of having many competitors, but in fact there are very few left.  Rocket Resume is one of the few independent rivals remaining.

-11-

43.    The geographic scope of this Market is the United States.[3]  U.S. job applicants typically put together resumes and apply for jobs within the U.S., and resumes created for U.S. job applicants are tailored to the preferences of U.S. employers.

44.    Tens of millions of Americans apply to jobs every year.  About 31% of the U.S. labor market—53 million workers—"engaged in some type of job-seeking activity" during November 2025 to January 2026.[4]  23.7 million youth were working or actively looking for work in July 2025.

45.    Resumes are critical to the job hunt, as they are often the first opportunity for jobseekers to market themselves to potential employers.  They are also the point at which many employers decide to cut a candidate from consideration.  As employers across all levels—from seasonal lifeguard jobs to corporate executive jobs—grow more sophisticated in their hiring processes, the expectation for a polished and effective resume continues to grow, making resume-building assistance increasingly important.

46.    The job application process is becoming more reliant on technology than ever.  Many employers now use digital job application portals and track candidates using an Applicant Tracking System ("ATS")—a technology used by 97.8% of Fortune 500 companies[5] to collect, sort, scan, and rank job applications.  An ATS often filters for continuity of employment, special certifications, and other hardline criteria that may not tell an applicant's full story, making formatting and filling in content (including specific words that are likely to get hits on particular job descriptions) important in applicants' resumes.

47.    However, according to a 2021 study conducted by Harvard Business School, these tools are often inflexibly configured and exclude viable candidates from consideration whose resumes do not match the exact criteria established by the job description.  88% of all employers

---

[3]    The precise contour of the geographic market is a topic to be refined pending discovery, and Rocket Resume reserves all rights to expand the geographic contours of the Market.

[4]    https://www.comptia.org/en-us/resources/research/job-seeker-trends/.

[5]    https://www.jobscan.co/blog/fortune-500-use-applicant-tracking-systems/.

-12-

agree that "*qualified high-skills candidates*" are vetted out of the process at the initial resume-review stage; that number rises to 94% in the case of middle-skills workers.

48.     In response to the digitization of the hiring process, job applicants worldwide have been increasingly using digital tools in building eye-catching resumes that pass ATS filters and stand out to human reviewers.

49.     Online resume-builders are web-based platforms that allow jobseekers to customize multiple resumes through easy-to-use interactive user interfaces.  These platforms offer a variety of services, including providing professionally designed templates, job-specific content suggestions, and feedback that assists jobseekers in creating professionally formatted, ATS-compatible resumes.  Online resume-builders also allow users to store their resumes in the cloud, enabling easy access and sharing of their resumes.

50.     Online resume-builders are often preferable to alternatives because they guide job applicants through the daunting process of creating a professional resume.  Instead of starting from scratch, which can be intimidating, applicants might choose an online resume-builder because they offer a variety of proven resume templates with cloud storage capabilities, to reduce formatting issues presented by word processing tools and assist users in finding tailored wording for the jobs they seek using proprietary content databases containing thousands of job-specific descriptions.

51.     Revenue models for online resume-builders range from subscription-based services to freemium (free or cheap at first, but customers must pay for advanced features) models, making professional resume creation accessible across different price points and user needs.

52.     The unique value of online resume-builders lies in their integration of multiple functions in the resume creation process.  Jobseekers using traditional alternatives must separately handle content creation, formatting, design, ATS optimization, and customization for different job applications.  Online resume-builders consolidate all these functions into a single platform and do most of the tedious work for the user, with the platform quickly guiding users along each necessary component without overlooking critical elements.  The platforms provide professional-quality results, within minutes, at price points far below what individual users could achieve by hiring professional resume writers or purchasing multiple separate tools.

CIVIL COMPLAINT

**2.      Online Resume-Building Platforms Are Not Reasonably Interchangeable With Other Tools**

53.     There are no resume-creation tools that are reasonably interchangeable with online resume-builders.

54.     Word processing software like Microsoft Word and Google Docs are not reasonably interchangeable with online resume-builders.  These programs may offer third-party resume templates (often for a fee) but they involve significant formatting effort and require users to generate job descriptions from scratch.  Users must research appropriate action verbs, job descriptions, and industry-specific terminology—all without guidance.  Word processing software does not offer tailored, job-specific wording or content suggestions based on different roles and industries.  Word processors such as Microsoft Word are also not free, and cost more than Online Resume-Building Platforms.

55.     AI chatbots such as ChatGPT, Claude, and Gemini are also not reasonably interchangeable with online resume-builders to create and refine resume content.  Indeed, for most of the relevant time period for this case, AI tools did not exist.  Today, users can ask AI Chatbots to streamline their bullet points for a resume and suggest catchy action verbs.  But AI chatbots are not a substitute for Online Resume-Building Platforms because they require users to generate their own prompts, do not offer formatting assistance, and may provide incorrect content.  Using AI chatbots to generate resumes also comes with challenges not present in Online Resume-Building Platforms.  For instance, AI chatbots generate only text and cannot be used to reliably help format a resume.  AI chatbots also require some expertise in prompt engineering.  Jobseekers who may not know how to structure effective prompts and iterate with AI may be disadvantaged compared to jobseekers who do.  AI chatbots also often operate on a costly subscription model, making them more expensive than many Online Resume-Building Platforms.

56.     AI chatbots also suffer from hallucination issues, requiring jobseekers to continuously verify AI-generated outputs.  AI chatbots indiscriminately collect and use data scraped from the internet, irrespective of the quality and accuracy of that data.  Additionally, AI chatbots do not offer templates to serve as a starting point for jobseekers.  AI chatbots are also often a one-time

service rather than having continuous iteration capabilities like Online Resume-Building Platforms. Lastly, AI writing style is often easily identified, which can cause resumes to be flagged by AI scanning tools.

57. Paying for a professional resume writing service is also not reasonably interchangeable with the use of an online resume-builder. Professional resume writing services employ certified resume writers with specific industry skillsets and career coaches who create customized resumes for individual clients on a one-on-one basis. These services typically operate through an intensive consultation process. First, clients must narrow down candidates for applicability and availability. Then, clients must schedule an initial consultation where they discuss their career history, accomplishments, and job search goals with a professional resume writer. Clients often continue to provide information about their job search goals, often through questionnaires or follow-up conversations. The resume drafter creates a customized resume over a time period of a few days, applying their expertise in industry-specific terminology, formatting, and more. There may be one to two rounds of revisions before delivering the final product. The cost for these services ranges widely based on experience level and complexity but is certainly much higher than the cost for Online Resume-Building Platforms. Google search is also not the predominant or primary way to seek out professional resume writers. Other distribution channels, such as referrals and word of mouth, are more commonly used with resume writers.

58. There are also mobile applications (e.g. iOS or Android applications) that offer some resume-related services. But these applications do not compete with entities in the Market because the two categories of services serve distinct customer bases: users of online resume-builders are typically seated at a desktop or laptop computer, engaged in a focused, document-intensive task that benefits from a full-size screen, keyboard, and the formatting precision that a browser-based interface provides.

59. Mobile app users, by contrast, are engaged in a qualitatively different experience optimized for smaller screens and touch-based input. Mobile apps cannot generate a full resume in readable size. Furthermore, these apps are only available on certain mobile devices, and often do not easily connect with web-based job applications. These differences in distribution channel, user

context, and functionality mean that mobile applications do not constrain the pricing or competitive behavior of Online Resume-Building Platforms.

60. Additionally, mobile applications that offer resume-building services differ from web-based platforms because customers who access resume-building services through mobile applications do so through an entirely different discovery and distribution channel—app store search and browsing—rather than through Google search, which is the primary channel through which customers discover and select an Online Resume-Building Platform like Rocket Resume.

61. Similarly, seeking assistance from a career services office or government workforce programs is not reasonably interchangeable with online resume-builders. Career services offices and government workforce programs provide free or low-cost resume assistance to eligible populations through educational institutions, government agencies, and non-profit organizations. Universities often offer resume review services, one-on-one counseling sessions, resume writing workshops, and access to template libraries for current students and alumni. The federal government and state governments also offer similar services to jobseekers.

62. These services, however, often include eligibility requirements and are not always proficient in specific job titles, especially those that these providers do not typically encounter. For example, university career services offices often require enrollment in the university in order to access resume-building assistance. Government workforce programs often face limited slots for assistance and prioritize unemployed individuals, residents of specific geographic areas, and individuals receiving public benefits. These services also offer varying quality of assistance depending on the individual career counselor. For these reasons, these services are not a substitute for Online Resume-Building Platforms.

63. LinkedIn also has a standard profile extraction tool in pdf format that users can repurpose as a resume; however, this is not interchangeable with online resume-builders. There is a vast difference in user experience between executing a search using Google and logging into LinkedIn to use LinkedIn-specific tools. Moreover, LinkedIn's online resume-builder requires users to have a manually populated profile with experiences, dates, skills, job titles, and other numerous details, and does not offer templates, catchy phrasing, or formatting customization. LinkedIn also

-16-

does not offer the full suite of features, such as ATS optimization, that tools like Rocket Resume provide.

64. At bottom, there are no reasonably interchangeable substitutes for Online Resume-Building Platforms. Word processors require users to handle formatting and content creation from scratch without guidance. AI chatbots cannot reliably format resumes, suffer from hallucination issues, and require prompt engineering expertise most jobseekers lack. Professional resume writing services cost significantly more, take days rather than minutes, and offer no continued access to tools or templates after delivery. Mobile applications use different distribution channels and provide a distinct user experience. Career services and government programs are limited by eligibility requirements and inconsistent quality. And LinkedIn's resume-builder requires a manually populated profile before a user can even begin. None of these alternatives offer the combination of speed, guided content suggestions, professional formatting, and accessible pricing that defines Online Resume-Building Platforms.

**3.      The Relevant Market Satisfies the Hypothetical Monopolist Test**

65. When faced with a price increase by an Online Resume-Building Platform, customers do not switch to word processors, AI chatbots, or resume writers in sufficient numbers to defeat the price increase—they either remain with the platform or switch to another Online Resume-Building Platform. For that reason, this relevant Market—the Online Resume-Building Platforms—satisfies the market definition test known as the hypothetical monopolist test ("HMT").

66. The HMT, commonly used by the Department of Justice and Federal Trade Commission, is one tool that can be used to evaluate the bounds of a potential antitrust market. It inquires whether a hypothetical monopolist in a market could impose a small but significant non-transitory increase in price (SSNIP) without diverting many customers to alternative options, such that the SSNIP would not be profitable to the monopolist.

67. This test is met with this Market of web-based platforms that assist jobseekers with creating professional resumes. In this Market, a hypothetical monopolist could profitably impose a SSNIP without losing enough customers as to become unprofitable. Even if prices for a hypothetical monopolist's platform were to increase by five to ten percent, jobseekers would still choose to pay

for an online resume-builder over alternatives. The convenience, knowledge base, and customization features, among other qualities of online resume-builders, would cause jobseekers to pay the SSNIP instead of turning to alternatives such as building a resume from scratch using a word processing tool or paying for a third-party career coach for resume creation.

68.    BOLD's own actions prove the SSNIP test is easily met. From July 2023 to March 2026, BOLD increased the prices on its resume-builder by 61%, without a meaningful reduction in market share.

### 4.    The Role of Google Search in the Relevant Market

69.    Jobseekers who utilize online resume-builders exclusively discover those platforms through online search, and overwhelmingly through Google search. Consequently, search engine visibility—especially through Google—is critical for Resume-Building Platforms' market participation and competitive survival. Other potential advertising channels, such as social media, are not viable for sourcing customers in this Market. First, customers searching for resume-builders act on immediate intent, which passive-discovery channels such as social media channels cannot capture. Online resume-builders also lack the broader brand awareness that renders these advertising channels successful. This has been evidenced by both a lack of usage of social media customer acquisition by nearly all brands in this Market and through years of testing by Rocket Resume.

70.    Online resume-builders depend on high-intent users who are actively seeking a solution to an immediate need, which makes search-based engines the primary viable channel for customer acquisition in the Market. Customers in this Market are looking to solve a specific problem—lack of a formatted, professional resume—as conveniently as possible through Online Resume-Building Platforms, and Google search is the most accessible and familiar method to access this Market. The vast majority of customers immediately turn to Google search; it is by far the most effective way to acquire customers in this Market.

71.    Google search results are divided into two categories: Sponsored and Organic results. Sponsored results are paid advertisements ("Ads") that appear at the top or bottom of the search results page. These Ads are selected through Google's automated advertising auction, which

determines both the ads shown for a particular search query and their placement on the page. In contrast, Organic results are unpaid listings that appear because Google's ranking algorithms determine they are most relevant to the user's query.

72. When a jobseeker searches for terms like "resume-builder," "online resume," or "create resume," Google's algorithm conducts a real-time auction among all advertisers who have bid on keywords related to that search query. These paid advertising auctions occur in milliseconds, every time a user performs a search.

73. For Online Resume-Building Platforms, Google search drives over 90% of all customer acquisition. Simply put, Google search is a must-have channel for acquiring a customer in the Market. Organic search results and Ads on Google represent the primary—and often only—way that customers discover and access resume-building services. Customers in the Market are looking to create their resume as conveniently as possible, and Google search has overwhelmingly been the most accessible and familiar method that customers are comfortable with to find an online resume-builder. In short, during the relevant time period of this case, almost every customer in the Market tried to solve for their lack of a professional, formatted resume by "Googling" it.

74. Providing additional support for the must-have nature of Google search in this industry, in April 2025, the United States District Court for the District of Columbia found that Google handles approximately 90% of all searches conducted in the United States. As described herein, advertising to customers executing online searches is an absolutely fundamental and critical marketing channel in the Market. As Google makes up approximately 90% of such searches, access to Google search is not merely one possible option among many—it is a necessary distribution channel. It is the dominant channel through which jobseekers discover Online Resume-Building services, and renders advertising through other channels largely cost-ineffective for businesses in this Market.

75. The fact that Google search plays such a critical role in this Market is further evidence that there is a distinct Market for Online Resume-Building Platforms. When customers search "resume builder," they are expressing a specific and high-intent need, and uninterested in engaging with the alternatives described above, such as resume reviewers, AI chatbots, or word

processing tools such as Microsoft Word or Google Docs.  They are seeking out dedicated Online Resume-Building Platforms such as Rocket Resume and the search results they return reflect this distinct Market.

**B.    BOLD IS A MONOPOLIST IN THE MARKET FOR ONLINE RESUME-BUILDING PLATFORMS**

76.    BOLD has achieved a dominant share of the Market for Online Resume-Building Platforms, with an estimated share of 80-90% in the United States.  As noted, BOLD did not achieve this dominance through superior quality or execution, but through deceiving customers by acquiring and maintaining a covert network of obfuscated BOLD entities, manipulating the Google search process, and making an aggressive effort to buy up all competitors and to stomp out those who it did not acquire.

77.    BOLD entities hold significant market share.  BOLD publicly describes My Perfect Resume as "the largest resume builder platform," while LiveCareer alone reports facilitating over 10 million resume creations.  Market research firms analyzing the resume builder industry confirm that "LiveCareer and its parent company, BOLD LLC, are major forces, owning several of the most popular tools available," with these brands holding "significant market share" in the sector.  Industry reports consistently identify several BOLD zombie entities including Zety, LiveCareer, Resume Genius, CareerBuilder, Resume Help, My Perfect Resume, Resume Lab, Resume-Now, and Resume Nerd as some of the Market's leading players.  As discussed below, however, these brands are only the tip of the iceberg.  Investigation has revealed that BOLD operates many more online resume brands than has previously been reported or disclosed.

78.    These BOLD-controlled sham entities appear entirely unrelated to customers and even to casual industry observers, featuring slightly distinct branding, separate websites with different domain names, different visual identities and color schemes, with slightly varied marketing messages and value propositions.  Each brand operates independent-appearing customer service operations with different support email addresses, and cultivates separate user review profiles on sites like Trustpilot and Google Reviews.  This fake projection of brand diversity creates a powerful

and deliberately cultivated illusion of market competition. But together, this vast armada of sham BOLD entities utterly dominates the Market for Online Resume-Building Platforms.

79. Rocket Resume is one of the last remaining rivals standing against BOLD's illegal and total monopolization, and perhaps the last significant independent competitor standing. But its very modest share highlights BOLD's utter dominance.

80. As one of the sole remaining independent competitors to BOLD's portfolio of ever-changing brands, Rocket Resume provides minimal discipline on BOLD's pricing and some pressure for service quality. Remove Rocket Resume, and even these constraints disappear. As it stands, Rocket Resume cannot continue growing, despite its competitive offerings, because BOLD's anticompetitive tactics make it impossible to acquire a meaningful number of customers.

81. If BOLD's anticompetitive conduct is allowed to continue, there is also no prospect of entry from new rivals that will generate competition. There are low natural barriers to entry with building an online resume-builder, yet BOLD's conduct creates substantial, artificial barriers to entry in the Market. As detailed herein, BOLD forecloses access to the critical distribution channel, Google search, making new entry virtually impossible.

82. As described below, BOLD shuts out competitors' Ads by coordinating its bids across its sham entities to box them out of access to top search positions. But more than just preventing growth for startups in the Market by limiting startups' Ads optimization, this practice also deprives startups of their ability to grow in Organic search results. Success in organic growth depends on learnings derived from the Ads space, and takes years of significant investment in content creation, back-link development and other strategies to achieve. BOLD's dominance in both Ads and Organic search results eliminates opportunities for growth in both spaces, further entrenching its monopoly and harming its competitors across all of search.

**C. DEFENDANTS MAINTAIN BOLD'S MONOPOLY THROUGH AN OVERARCHING ANTICOMPETITIVE COURSE OF CONDUCT**

83. Defendants have maintained BOLD's monopoly through an overarching course of anticompetitive conduct that spans over a decade. The various aspects and components of this

overarching scheme work together to utterly destroy competition in the Market for Online Resume-Building Platforms and ensure BOLD maintains its control of the Market.

84. While some facets of BOLD's conduct are anticompetitive in isolation, BOLD's conduct is even more egregious when examined holistically for its overarching anticompetitive effects. All components of the scheme, as detailed below, are mutually reinforcing with the shared purpose of ensuring no actual or potential rival can engage in meaningful competition with BOLD or threaten its monopoly position.

85. As detailed below, BOLD's conduct includes: (1) constructing a sprawling web of sham entities to monopolize the Market; (2) manipulating Google search results through price-fixing, sham competition, and predatory over-bidding; (3) engaging in de facto exclusive dealing of the critical distribution channel in this Market; and (4) weaponizing litigation with anticompetitive intent.

### 1. Defendants Construct a Sprawling Web of Sham Entities To Monopolize the Market

86. At the center of BOLD's scheme is its construction of a web of sham entities, tracing back to the early 2000s. As described further below, one way BOLD has absorbed additional brands is through litigation. For instance, after suing former competitors Resume Companion and Resume Genius, BOLD folded them into its web of entities.

87. At first glance, both sites—still in operation at www.resumecompanion.com and www.resumegenius.com—are independent of BOLD. They appear to be owned by a company called "Sonaga Tech Limited," a company that appears to be unaffiliated with BOLD. For example, the below screenshots present Resume Genius and Resume Companion, respectively, as "owned and operated by Sonaga Tech Limited," with no mention of BOLD.



88.     In reality, Sonaga Tech Limited is not the independent Swiss company it purports to be.  According to the Trademark Assignment Cover Sheet pictured below, BOLD Limited, Works Limited, and Sonaga Tech Limited are, in fact, all part of the BOLD umbrella, applying for trademarks together.  This Cover Sheet also confirms Resume-Now, My Perfect Resume, and Resume Check as belonging to the BOLD umbrella.  This Cover Sheet was signed by Heather Williams on BOLD Limited and Works Limited's behalf, showing her knowledge of and active participation in BOLD's anticompetitive scheme.

-23-

900532931   01/29/2020
**TRADEMARK ASSIGNMENT COVER SHEET**

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM559415

| SUBMISSION TYPE: | NEW ASSIGNMENT |
| NATURE OF CONVEYANCE: | SECURITY INTEREST |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
| --- | --- | --- | --- |
| BOLD LIMITED | | 01/13/2020 | Company: BERMUDA |
| WORKS LIMITED | | 01/13/2020 | Company: BERMUDA |
| SONAGA TECH LIMITED, HAMILTON, ZEIGNIEDERLASSUNG LUZERN | | 01/13/2020 | Corporation: SWITZERLAND |

Conveyors of the trademarks below indicating that Bold Limited, Works Limited and Sonaga Tech Limited are owned and operated by the same entity which owns the trademarks below

**RECEIVING PARTY DATA**

| Name: | HSBC Bank USA |
| --- | --- |
| Street Address: | P.O. Box 2013 |
| City: | Buffalo |
| State/Country: | NEW YORK |
| Postal Code: | 14240 |
| Entity Type: | National Banking Association: UNITED STATES |

**PROPERTY NUMBERS Total: 31**

| Property Type | Number | Word Mark |
| --- | --- | --- |
| Registration Number: | 5749977 | HLOOM |
| Registration Number: | 5700580 | RESUME-NOW POWERED BY: LIVECAREER |
| Registration Number: | 5719077 | COVER-LETTER-NOW POWERED BY: LIVECAREER |
| Registration Number: | 4691314 | COVER-LETTER-NOW |
| Registration Number: | 5518464 | MY PERFECT COVER LETTER |
| Registration Number: | 5700582 | MYPERFECTRESUME |
| Registration Number: | 4780241 | MY PERFECT RESUME |
| Registration Number: | 5249024 | JOBHERO |
| Registration Number: | 5140254 | MIGHTYRECRUITER |
| Registration Number: | 5187567 | BOLD |
| Registration Number: | 5177476 | BOLD |
| Registration Number: | 4676848 | RESUME-CHECK |
| Registration Number: | 4610718 | JOBTAP |
| Registration Number: | 3976788 | LIVECAREER |
| Registration Number: | 3571241 | LIVECAREER |

OP $790.00   5749977

900532931

**TRADEMARK**
**REEL: 006849 FRAME: 0604**

89.   BOLD has tried to obscure these connections.  But Rocket Resume's investigation has revealed that some websites list Sonaga Tech Limited's address as in Hamilton, Bermuda.[6]  The Trademark Assignment Cover Sheet above shows that BOLD Limited also operates out of Bermuda. However, on its website, BOLD lists its places of operation simply as only the United States, Puerto

---

[6]   https://www.dnb.com/business-directory/company-profiles.sonaga_tech_limited.373dd81dbb1a75d9a62050031e830e1f.html.

-24-

Rico, Poland, and India.  BOLD does not disclose its Bermuda operations on its website to minimize any visible links between BOLD and Sonaga Tech.

**(a)     Resume-Now: A Case Study**

90.     BOLD's web of deception extends far beyond Sonaga Tech.  For instance, www.resume-now.com purports to be a resume-builder independent of BOLD.  As the screenshot below shows, the website purports itself to belong to something called "NOW Limited" with no mention of BOLD.

91.     As with "Sonaga Tech," however, it turns out that NOW Limited is just another entity controlled by BOLD and its owners, Jackson and Freundlich.  First, its trademark on the United

-25-

States Patent and Trademark Office website[7] shows that it is registered in Bermuda, a country with which both BOLD and Sonaga Tech have connections.  The most recent activity on the trademark hides NOW Limited's connection to BOLD, and shows its attorney information as lawyers from Katten Muchin Rosenman LLP and Convergence Intellectual Property Law P.C.

92.     But digging into the trademark's history reveals Resume-Now's connection with BOLD.  As shown in the screenshot below, in 2015, an attorney from LiveCareer (BOLD's predecessor and current BOLD brand), submitted a Change of Correspondence Address application, revealing that BOLD is behind the Resume-Now brand.

93.     Resume-Now is thus a prime example of BOLD's deceptive and fraudulent conduct.  As shown in Paragraph [90], Resume-Now purports to be owned by NOW Limited on its website.  Its customer service email address, customerservice@resume-now.com, links to a resume-now.com domain.  But all of this is a front—Resume-Now is just another sham entity operated by BOLD.

94.     In addition to the obscure trademark history, which slipped through the cracks of BOLD's scheme, BOLD slipped up again in Resume-Now's lengthy and obtuse User Agreement.

_____

[7]  https://tsdr.uspto.gov/#caseNumber=86293617&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch.

-26-

Specifically, inconsistent with Resume-Now's fictitious branding on the website and contact information, BOLD revealed itself to be the real party of interest in some clauses of that Agreement, stating (1) "BOLD may limit the availability of the site and service to any person or geographic area at any time;" (2) "If you are located in the US, then the transaction will be processed by BOLD LLC;" (3) that any opt-out arbitration requests should be sent to BOLD LLC within thirty days of agreeing to these terms.

### (b)    BOLD Deceives the Industry

95.    BOLD purposefully hides its sprawling network of sham entities to confuse customers, competitors, and review sites, and make it difficult for them to realize that the different resume-building companies are, in fact, the same company.

96.    For instance, BOLD has fooled even reputable review sites like Forbes into believing that its brands are different. In the below screenshot of a Forbes Advisor page recommending resume-builders, all four of the top recommendations—Resume-Now, My Perfect Resume, LiveCareer, and Zety—are BOLD-affiliated brands. In short, BOLD's conduct has deceived not only customers and competitors, but it has also duped review sites—sites that occupy top ad slots in Google search—into believing they are reviewing discrete companies that are, in actuality, the same company.



97.     By presenting all of these companies under the guise of separate websites, BOLD creates search fatigue among customers in the Market, who only later find out they have been duped by BOLD's deceptive business model.  In particular, under BOLD's approach, which it has caused to be pervasive in the Market, customers are lured in with the promise of building a "free" resume.[8] After they fill in their information and move along to the final step of the workflow, they are then surprised by the need to pay a fee to download the resume—while they were able to *build* it for free, *downloading* it is another matter.  The payment for download is styled as a low fee, perhaps ranging from $1.85 to $2.95.  Yet the fine print subjects the customer to a subscription, where the customer is charged $1.85 to $2.95 for the first month and then *$19.99 to $23.95 every four weeks* thereafter. Customers who are not studious about their credit card bills thus may end up spending hundreds of dollars for the resume they built and downloaded once.

98.     BOLD's sham entities all use this, or a very similar, pricing model.  To the extent BOLD argues these entities are "separate," then its conduct would amount to blatant price-fixing because such a predatory strategy could only be maintained if the vast majority of competitors in the marketplace agreed to use it.

99.     Customers that are dismayed with their experience on one of BOLD's sham entities (say, Resume-Now), may shop elsewhere.  But what's elsewhere in this market?  Overwhelmingly, they will be unknowingly funneled to another BOLD sham entity.  And there they will confront the same poor customer experience that upset them in the first place.  BOLD's deceptive business model therefore dominates the landscape, discourages customers, and destroys competition on the merits.

100.    Although media and industry sources have failed to expose BOLD, some competitors and customers have also begun to notice some irregularities.  For instance, BOLD's deception has been recognized by Sheets Resume Builder, one of the few other small rivals in the Market.  On its website, Sheets Resume Builder explains that "many of the top resume builders on Google are

---

[8]   Rocket Resume reluctantly elected to employ a similar pricing strategy as the only means to survive in the market against BOLD's conduct.

-28-

owned by the same conglomerate (BOLD.com), presenting jobseekers with the *illusion of choice*."[9] Recognizing the futility of competition, Sheets Resume Builder even states "BOLD, if you're reading this, please reach out to team@sheetsresume.com and make us an offer.  For the right EBITDA multiple, we'll totally sell out, delete this blog post, and join the fam[ily]."[10]

101.    Additionally, a jobseeker named A.M.Neal wrote: "When I began researching Resume Genius' backstory, it seemed simple—Resume Genius is a company operating out of Taipei, Taiwan and is a subsidiary of Sonaga Tech Limited based in Switzerland.  Curious about leadership at Resume Genius, I scoured their 'About' page . . . and LinkedIn, and was unable to identify a founder or executive for that matter.  Sonaga Tech proved to be even more elusive – no website, no LinkedIn page – just a total mystery."[11]

102.    BOLD also furthers its scheme by publishing fake articles—stylized as objective testimonials—comparing BOLD resume-builders and competitors like Rocket Resume.

103.    For instance, as early as 2023, these articles have purported to review Rocket Resume and compare it unfavorably to BOLD entities Resume Genius[12] and Resume Lab.[13]  These articles are replete with misrepresentations designed to lure customers to BOLD entities over Rocket Resume, calling Rocket Resume's platform derogatory terms such as unspecific, fragmentary, meaningless, generic.  These articles also include statements falsely claiming that Rocket Resume's product "doesn't follow a proper resume summary format," and that Rocket Resume does NOT offer free templates on its homepage, when it does.

104.    Further, these articles falsely state that BOLD entities offer "more specific" bullet points and create output that is "much more effective and impactful" than Rocket Resume, and that Rocket Resume "doesn't include the option to download your resume before purchasing" which is

---

[9]  https://sheetsresume.com/blog/resume-builders-owned-by-bold.

[10]  *Id.*

[11]  https://amneal.medium.com/resume-genius-is-it-worth-a-damn-abd940a20e8d.

[12]  https://resumegenius.com/reviews/rocket-resume-reviews.

[13]  https://resumelab.com/career-advice/rocket-resume-review.

-29-

untrue.  The fake testimonials additionally misrepresent that "Rocket Resume isn't really free" and that "to download your resume after building it, you need to pay a fee."

105.    BOLD presented the articles as an objective comparison of the resume builders.  Yet they are far from an objective comparison.  Instead, the articles falsely represent that neutral third parties have objectively used Rocket Resume and BOLD entities, found Rocket Resume lacking in independent respects, and deemed BOLD entities better than Rocket Resume—again, based on misrepresentations and false statements of fact.  In actuality, these "reviewers" did not objectively use Rocket Resume's services and deem them inferior; BOLD manufactured the appearance of neutrality to obfuscate its true intentions.

106.    This is no mistake.  BOLD's obfuscation is deliberate, and it harms competitors, customers, and search engines alike.  Customers are harmed because they are deceived into thinking they are shopping in a competitive market, and browsing a diverse Google marketplace, when in reality they are stuck paying supracompetitive prices to a hidden monopolist.

107.    Customers who do shop around will be deceived into thinking that BOLD's pricing model is just how the Market works.  Competitors are harmed because they are forced to adapt to the marketing and pricing strategies of BOLD brands, which dominate the Market.  And search engines—namely Google, the critical distribution channel for this Market—are also duped by BOLD's deceptive practices into believing they are facilitating a fair and competitive marketplace.

**2.    Auction Manipulation and Predatory Over-Bidding**

108.    BOLD additionally maintains its dominant position through its deceptive manipulation and predatory over-bidding in the critical marketing channel in the Relevant Market—sponsored results that show up as a result of Google search queries.

**(a)    Google's Policies and BOLD's Evasion**

109.    As described above, manipulation of Google search results is an important pillar in Defendants' scheme to protect BOLD's monopoly power in the Relevant Market.  In the context of competing for paid advertisements, a dominant player is able to crowd out rivals by flooding the distribution channel with sham entities and sham advertisements.  Doing so would be

-30-

anticompetitive in any distribution channel.  But when it comes to Google search in the Relevant Market, such conduct is literally fatal to competition.

110.    Consistent with these economic principles, and to ensure a fair and competitive market for search results, Google has long had an "Unfair Advantage" policy that provides that "Using the Google Network to gain an unfair traffic advantage over other participants in the auction" is "not allowed."  This Unfair Advantage policy reflects Google's understanding that, if left unchecked, large companies could flood the auction results to effectively foreclose smaller rivals from securing any traffic.  BOLD's practice of pretending that separate, independent companies are bidding against each other, when in actuality BOLD and its owners are deceptively providing a set of coordinated bids for a slew of sham entities controlled by BOLD and its owners, clearly violates Google's policy.[14]  The effects of this anticompetitive coordination are amplified when BOLD occupies many of the top auction results, relegating rivals to the fringes.

111.    Google's Circumventing Systems policy also prohibits "[e]ngaging in practices that circumvent or interfere with Google's advertising systems and processes, or attempting to do so."[15]

112.    BOLD's actions violate these policies.  They are designed to provide BOLD with the very "unfair advantage" that Google's policies are meant to prevent.  As mentioned above, BOLD's sham entities offer functionally identical services, and typically, the only differences are cosmetic: color schemes, logos, and domain names.  Although BOLD presents these brands as independent competitors in order to overwhelm Google's search results, closer examination reveals the facade.

113.    Importantly, these sham entities also draw content from the same "Text Tuner Content" database, confirmed through U.S. Copyright Office registrations.  BOLD purports to own and operate the Text Tuner Content database.  BOLD's U.S. Copyright Office registrations for its "Text Tuner Content" database—including TX0008919525 (2018 version), TX0008919529 (2019

---

[14]  As of April 2025, Google updated its policies to indicate that a company could bid for different placements on a search page.  However, the policy continues to prevent a company from bidding to gain an Unfair Advantage, which includes bidding for multiple spots in the same placement on a search page—exactly what BOLD and its owners have been doing.

[15]  https://support.google.com/adspolicy/answer/15938075?hl=en.

version), and TX0008919521 (2020 version)—cover the job description content used across multiple BOLD brands.  This establishes that My Perfect Resume, Resume Genius, Resume Nerd, and other BOLD platforms all operate using the same proprietary content repository.

114.    Corporate communications, LinkedIn profiles of BOLD executives, copyright registrations, and other publicly available records all point to a single conclusion: these ostensibly separate brands are managed centrally, with coordinated marketing strategies and unified decision-making.  This web of BOLD entities deceives Google and subverts Google's advertising policies.

115.    Google takes its advertising policies seriously.  For instance, Google employs a combination of AI and human review to detect policy violations.  Google blocks violative Ads until the issue is resolved; for more serious or repeated offenses, Google applies a strike system and can suspend accounts and users entirely.

116.    Indeed, in some cases Google appears to have enforced its policies against BOLD.  Each time Google enforces its policies and removes one of BOLD's sham entities from the auction, however, BOLD simply substitutes another entity, changes a domain name, or creates a new façade to restore its dominance over the advertising results.  For example, in response to Google's efforts to halt BOLD's double-serving, BOLD merely pivoted to using slight variations on its domain names, moving ResumeGenius from www.resumegenius.com to www.resumegenius.co and ResumeNerd from www.resumenerd.com to www.resumenerd.ai, creating the appearance of new unrelated entities.  None of these domain switches were accompanied by any substantive changes to the websites and products.

117.    These actions show that Google's enforcement mechanisms on their own cannot effectively address BOLD's conduct because Defendants continuously adapt their tactics to exploit limitations in detection systems.  Google's policies rely on self-reporting and assume good-faith compliance; BOLD systematically exploits this trust by affirmatively misrepresenting its sham entities as numerous independent competitors.  Google's automated systems struggle to identify common ownership when operators deliberately obscure connections through domain variations and cosmetic brand differentiation.

CIVIL COMPLAINT

118.    Defendants' auction manipulation, a form of bid rigging, is clear anticompetitive conduct.  By manipulating Google's auction results and price-fixing bids across a plethora of sham entities, BOLD reserves this critical distribution channel for itself to the detriment of rivals.  Rivals lose meaningful access to the critical input in this Relevant Market and are therefore foreclosed from competition.

### (b)    BOLD's Bidding Strategy to Foreclose Competition

119.    BOLD's bidding strategy also forecloses rivals from effective competition.  By spreading out its costs across multiple fictitious entities, and artificially inflating BOLD's effective "click-through rate" (the percentage of people who see a search result and actually click on it—calculated by dividing the number of clicks by the number of times the link was shown, and then multiplying by 100), BOLD creates artificial advantages for itself that harm competition and exclude competitors.

120.    BOLD's predatory bidding strategy on Google search constitutes monopolistic conduct designed to exclude competing Online Resume-Building Platforms from the primary channel through which customers discover and select such services.  Because BOLD charges customers $0 for access to its resume-building tools, every dollar BOLD spends on Google search advertising represents a net short-term loss on each customer acquired through that channel.  BOLD's bids for competitive keyword placements far exceed any reasonable measure of the short-term revenue those bids generate—indeed, they exceed it by the full amount of the bid, because the short-term revenue is zero.  BOLD is able to do so only because it is pursuing a long-term strategy to dominate the Google search channel at the expense of independent rivals, accepting certain short-term losses in exchange for durable market power.

121.    BOLD faces an uncertain probability of recouping these losses.  BOLD's predatory overbidding is systematically driving independent Online Resume-Building Platforms out of competitive visibility on Google search, depriving them of the customer acquisition channel on which their businesses depend.  As independent competitors are marginalized or eliminated, BOLD is positioned to—and, in fact, already does—convert its growing captive user base into paying subscribers at supracompetitive prices, through premium feature upsells, recurring subscription

charges, long-term optimization of free organic traffic, and other monetization strategies that would be unsustainable in a competitive market. BOLD's sham entity strategy further ensures recoupment by foreclosing the most likely escape route for dissatisfied customers: switching to a competitor.

122. Customers who attempt to leave one BOLD-controlled platform are often funneled—unknowingly—to another paid Ad that is really just a BOLD-controlled platform masquerading as an independent alternative. This web of sham entities enables BOLD to recapture churning customers rather than lose them to genuine competitors, dramatically increasing customer lifetime value and ensuring that losses incurred through predatory overbidding are recouped many times over as the competitive field narrows and BOLD's dominance becomes self-reinforcing.

123. The following analysis uses illustrative assumptions to demonstrate the mechanics of BOLD's cost-spreading and customer-recapture advantages, to lower BOLD's effective Customer Acquisition Cost ("CAC"). The specific click-through rate percentages and pricing figures used are representative examples based on typical auction conditions; actual figures vary dynamically based on keyword, time period, and market conditions. It also uses a customer lifetime value in the online resume-building of approximately $80 per customer, depending on subscription duration and additional services purchased, and assumes 15% of customers that click end up as paying customers ("converted customers").

124. Google's auction system creates a descending price structure where higher advertising positions command higher costs per click, with prices declining substantially as position rank decreases.[16] This price structure arises from the interaction of Google's second-price auction mechanism and the differential value of advertising positions based on click-through rates.

125. In a second-price auction, the advertiser winning position 1 pays an amount slightly above the bid submitted by the advertiser in position 2.

---

[16]   In reality, Google also evaluates advertising quality and search context, among other factors, when selecting advertisement position. For purposes of this Complaint, Rocket Resume assumes all factors other than price are equal to show the anticompetitive effects that can arise from Defendants' bid-rigging conduct.

126.    Because position 1 is so critical to this industry, generates more customer value, and produces substantially higher click-through rates than position 2 (for example, suppose approximately 45% of clicks go to position 1 versus 25% going to position 2 and 15% going to position 3), advertisers are willing to pay much more per click for position 1.  The high value of position 1 drives up the position 1 bid, which through the second-price mechanism establishes the price for position 2.  Additional nuance exists because the value of customers who purchase and click the top advertising spot is higher than customers who click the lower positions.  Customers who click the top advertising spot are more likely to have strong intent and are significantly more valuable to the resume-building service.

127.    For resume-builder keywords during the relevant period, exemplary prices might have been approximately $15 per click for position 1, $7 per click for position 2, and $5 per click for position 3.  Position 4 and lower may command costs of $3-4 per click, reflecting the dramatically reduced click-through rates at these positions.

128.    BOLD's multi-brand strategy allows it to capture all three top positions simultaneously while paying a blended average cost per click dramatically below the position 1 rate. Out of 100 total paid clicks, the following results would occur.  If BOLD bids $15 for position 1 (My Perfect Resume), $7 for position 2 (Resume Genius), and $5 for position 3 (Resume Nerd), BOLD's total costs would be: (45 clicks × $15) + (25 clicks × $7) + (15 clicks × $5) = $925.

129.    At 15% conversion, BOLD would capture approximately 13/85 total customers through clicks across the three positions at an average CAC of approximately $71.15 per customer ($925 ÷ 13 customers).  This represents a roughly 30% discount compared to the $100 CAC (45 clicks x $15 ÷ 6.75) that a competitor would incur with a "position 1 only" strategy.

130.    In addition to having an artificial cost advantage, BOLD's numerous sham entities together artificially inflate BOLD's conversion rates.  Suppose a customer clicks on My Perfect Resume and builds a "free" resume, but then later is displeased with My Perfect Resume's recurring charges.  When that customer comes back to re-run her search on Google, with the goal of avoiding My Perfect Resume, BOLD captures a second opportunity when that customer, unbeknownst to them, encounters another BOLD brand with Resume Genius or Resume Nerd which has nearly

identical pricing.  This has a double effect, as the customer is deceived into thinking the pricings are consistent in the market and is less compelled to shop around for less duplicative options.

131.   This recapture effect might increase BOLD's effective conversion rate from, for example, approximately 15% to 25% (when customers encounter BOLD brands multiple times across positions 1, 2, and 3).  With 25% conversion across 85 clicks, BOLD acquires approximately 21 customers rather than 13 customers.

132.   At $80 customer lifetime value, BOLD's 21 customers generate $1,680 in revenue. Against advertising costs of $925, BOLD achieves profit of $755 per 100 clicks on paid advertisements—an 82% profit margin.

133.   Now consider a competitor like Rocket Resume in the same hypothetical that abides by the rules and Google's policies.  Ultimately, Rocket Resume is left with a strategy that is economically irrational and unsustainable.  Here is why.

134.   To compete for position 1, Rocket Resume must bid at least $15 per click to match or exceed BOLD's bid.  At $15 per click for position 1, Rocket Resume pays $675 for the 45 clicks that position generates (per 100 total clicks on paid advertisements).  This means Rocket Resume faces a significantly higher CAC as it cannot spread its costs across multiple advertising slots.

135.   As mentioned above, BOLD's average cost-per-click of $10.88 represents a roughly 30% discount compared to the $15 per click that Rocket Resume must pay to compete for position 1.  This cost differential is not the result of superior operational efficiency, better negotiated rates, or volume discounts—it results entirely from BOLD's deceptive multi-brand bidding scheme.

136.   In addition, Rocket Resume lacks BOLD's customer do-over advantage.  A customer who clicks Rocket Resume's advertisement but does not purchase is lost to Rocket Resume. Subsequent searches by that customer present BOLD brands, providing BOLD with second and third conversion opportunities while Rocket Resume's conversion rate remains fixed at the lower hypothetical 15%.

137.   With a 15% conversion rate typical for single-brand advertising, Rocket Resume acquires approximately 7 customers out of the 45 clicks.  At $80 customer lifetime value, Rocket Resume's 7 customers generate $560 in revenue.  But Rocket Resume needs to pay a CAC of $100

to get that customer, and incurring losses to obtain customers is economically irrational and unsustainable. To compete effectively for market share, Rocket Resume would need to participate in hundreds of thousands to millions of clicks annually. The losses add up quickly.

138. Rocket Resume cannot solve this problem by competing for lower-cost positions either. While Rocket Resume might achieve marginal profitability by winning lower-cost position bids, Rocket Resume could not achieve a viable operating scale that could cover its fixed costs. In addition, customers that click on lower-position slots are typically repeat customers who have been deceived by BOLD's business strategies in the past—that means they are less likely to become valuable, recurring customers for whichever brand wins the fourth or fifth sponsored advertising slot.

139. BOLD may rationalize to itself that this strategy is just good business—a clever way to exploit multiple branding. Nothing could be further from the truth. Some industries do feature single entities with distinct brands. For example, General Mills holds the brands Cocoa Puffs, Cinnamon Toast Crunch, and Reese's Puffs. But General Mills differs from BOLD's deception in several ways. First, General Mills does not pretend that it is actually multiple competitors. The General Mills logo is prominently displayed on all of its brands. Moreover, while General Mills may sell these brands at the same grocery store, it does so in competition with many other entities (such as Kellogg's, Post, and store generic brands). And unlike the Relevant Market, where there is one primary distribution channel—Google search—there is robust competition in cereal distribution, with a variety of in-person and online retailers. If the Market and BOLD were properly analogized to the breakfast cereal market, there would only be one grocery store, and General Mills would lock up 95% of the shelf space while hiding its branding and pretending all its "brands" were independent competitors. Such a strategy would be obviously and blatantly anticompetitive.

140. At bottom, BOLD's bidding scheme raises Rocket Resume's costs above sustainable levels while keeping BOLD's own costs below sustainable thresholds. This is the essence of a predatory strategy.

### 3.     De Facto Exclusive Dealing Through Foreclosure of the Critical Distribution Channel

141.    As described above, unlike other industries where companies can reach customers through multiple channels such as retail partnerships, direct sales forces, social media advertising, or word-of-mouth referrals, the Market depends almost entirely on search-based customer acquisition through Google.  There is no meaningful alternative path to reach customers at scale other than Google search.

142.    BOLD's coordinated multi-brand and multi-pronged strategy is an example of de facto exclusive dealing with this critical distribution channel.  It has no formal exclusive dealing contract with Google; to the contrary, BOLD has taken de facto control of the Google distribution channel.  Indeed, BOLD's conduct violates numerous contracts with Google including Google's Terms of Service and advertising policies.  By deploying numerous sham entities to simultaneously bid on and occupy the top sponsored advertising positions on Google search, BOLD has effectively reserved for itself the only viable means of reaching customers in the Market.  The result is that competitors like Rocket Resume are foreclosed from meaningful access to the distribution channel upon which their survival depends, just as if BOLD had entered into a formal exclusive dealing contract with Google.

143.    The degree of foreclosure is significant.  As mentioned above, BOLD captures approximately 2.5 of the top advertising slots per search in the critical Google search results when a user runs typical keyword searches for online resume-builders.  BOLD controls the very top sponsored position the vast majority of the time.  In practical terms, when a jobseeker searches Google for an online resume-builder, virtually every sponsored result the jobseeker sees belongs to BOLD, even though those results appear to be independent brands.  Competitors like Rocket Resume are relegated to lower positions, if they appear at all, where click-through rates are a fraction of the top slots and customer acquisition is economically unsustainable.

144.    This foreclosure is systematic, persistent, and structural.  BOLD's sham entity network allows it to strangle the critical distribution channel on an ongoing basis—day after day,

search query after search query.  BOLD's de facto exclusive dealing is self-reinforcing and indefinite.  The foreclosure is thus durable and effectively permanent.

145.    Moreover, BOLD's foreclosure of Google search has downstream effects that compound the exclusionary harm.  Success in paid search advertising generates data and insights that are essential to developing effective organic search strategies.  Competitors who are shut out of the paid advertising channel are simultaneously denied the opportunity to develop the long-term market knowledge gained by Ads results to functionally compete in organic search results.  BOLD's dominance in paid search thus translates into dominance in organic search as well, creating a feedback loop that further entrenches BOLD's control over the distribution channel and further forecloses competitors.

146.    The anticompetitive effects of BOLD's de facto exclusive dealing are severe.  Rocket Resume and other independent competitors cannot sustainably acquire customers through the only viable distribution channel.  New entrants face an effectively impenetrable barrier: even if they develop a superior product, they cannot reach customers because BOLD has monopolized the means of discovery.  The result is a Market that BOLD monopolizes not because BOLD offers a better product at a better price, but because BOLD has seized control of the gateway through which all customers must pass.

### 4.    BOLD Abuses Litigation As a Weapon to Expand Its Complex Web of Sham Entities

147.    As a final and lethal facet of the overarching course of conduct, BOLD has systematically deployed copyright infringement litigation against emerging competitors in the Market for over a decade, using meritless or weak legal claims to drain competitors' financial resources and then pressure them either to become a cog in the BOLD machine or exit the market altogether.

148.    BOLD launched its first public lawsuit, *LiveCareer Ltd. v. Mint Media, Inc.*, 3:14-cv-3420 (N.D. Cal.), on July 28, 2014.  BOLD's LiveCareer lawsuit alleged barebones copyright infringement and Lanham Act claims against Mint Media's website www.resume-direct.com ("Resume Direct").

-39-

149. BOLD launched its second lawsuit, *LiveCareer Ltd. v. Resume Companion LLC and Su Jia Technologies Ltd, dba ResumeGenius.co*, 3:14-cv-03336-DMR (N.D. Cal.), on July 30, 2014. LiveCareer again alleged similarly barebones copyright infringement and Lanham Act claims against Su Jia Technologies Ltd's www.resumegenius.com ("Resume Genius") and www.resumecompanion.com ("Resume Companion").

150. BOLD did not bring its claims in good faith. The claims were threadbare at best, spanning just around one page for each of the lawsuits. BOLD brought these claims not to assert legitimate legal rights, but rather to eliminate Resume Direct, Resume Genius, and Resume Companion as competitors. As described above, those entities that are not litigated directly out of the market are subsumed into BOLD's intricate web of sham entities.

151. Defendants' litigation strategy is a pillar in its overarching scheme to maintain BOLD's monopoly power. When a competitor gains any market traction despite BOLD's other anticompetitive conduct, BOLD initiates copyright litigation with anticompetitive intent to divert that competitor's resources from customer acquisition to legal defense.

152. The litigation targets are selected based on competitive threat rather than legitimate infringement. BOLD waits until a competitor achieves sufficient market presence to threaten BOLD's monopoly, then files an abusive and predatory copyright lawsuit.

153. As mentioned above, BOLD kicked off this litigation strategy by 2014 at the latest, when it sued Resume Companion and Resume Direct. Both lawsuits involved the same LiveCareer websites, the same alleged copyrighted materials, and the same legal theories pursued against different resume-building competitors.

154. The simultaneous filing of two substantially identical lawsuits against separate competitors demonstrates a coordinated litigation campaign rather than legitimate enforcement of intellectual property rights against particularized violations. The lawsuits also relied upon thin pleadings, often containing just over a single page of substantive allegations.

155. The Resume Companion litigation dragged on until late 2015, imposing substantial litigation costs on those defendants over an extended period. Resume Companion and Su Jia Technologies ultimately settled out of court with LiveCareer, with settlement terms undisclosed.

Following the settlement, Resume Companion and Resume Genius began operating under a sham entity called Sonaga Tech. As explained above, despite its different name, Sonaga Tech is owned and/or operated by Defendants.

156. The Mint Media litigation similarly resulted in settlement on terms undisclosed to the public. Mint Media has since ceased operations. BOLD successfully destroyed its Resume-Building Platform, www.resume-direct.com, as an independent competitor in the market.

157. BOLD's early suits against Resume Companion and Resume Direct sent a message to actual and potential rivals—either help build out BOLD's secretive and sprawling web of sham entities or face destruction. Given the precedents set by the early suits and the outside threat of excessive litigation costs, other companies folded immediately upon receiving threatening communications from BOLD.

158. For example, in January 2019, BOLD added Zety (formerly Interview.me) to its complex web of sham entities. Zety was a relatively popular independent rival in the Market and had achieved significant market share. But Zety, intimidated by BOLD's bullying tactics, sold out into the scheme and is now another zombie entity operating on behalf of Defendants. BOLD similarly absorbed FlexJobs into its scheme in January 2023-2024. FlexJobs operated the largest job search site for remote work and represented an adjacent competitive threat to BOLD's career services monopoly. While FlexJobs is not an Online Resume-Building Platform, it now directs customers seeking such services to www.myperfectresume.com, which is one of the many resume-building brands in BOLD's portfolio.

159. BOLD next subsumed ResumeBuilder.com in 2024. ResumeBuilder.com had achieved market presence sufficient to appear in industry analyses and customer rankings of Resume-Building Platforms. It is now a zombie entity working on behalf of Defendants. BOLD also co-opted Sonara.ai in 2024. BOLD subsequently shut down Sonara's operations briefly in February 2024 before merging its technology into BOLD's web of sham entities.

160. BOLD next absorbed CareerBuilder and Monster in July-August 2025 for $28.4 million following their Chapter 11 bankruptcy filing. This gave BOLD control over two of the most iconic brands in online recruitment, further shoring up BOLD's dominance. Yet in accordance with

its typical duplicitous behavior, BOLD deceives visitors to these websites by neglecting to disclose their affiliations with BOLD.  Instead, BOLD lists both of these websites as belonging to "MCB Bermuda Ltd."

161.    The consistent pattern is absorption of competitors followed by either converting the competitor into a sham zombie entity (Zety, Resume Builder, Resume Genius) or outright shutdown (Resume Direct).

162.    BOLD's anticompetitive litigation strategy continues through the present.  BOLD continues to monitor competitors for potential litigation targets and maintains capacity to initiate litigation against emerging threats to its monopoly position.  BOLD's litigation strategy remains an active component of Defendants' anticompetitive conspiracy.

**5.    BOLD Attempts to Neutralize Rocket Resume**

163.    BOLD has used the same tactics against Rocket Resume.  On February 18, 2022, BOLD Limited filed a complaint against Rocket Resume, Inc. and Stephen Zimmerman in the United States District Court for the Northern District of California, Case No. 5:22-cv-01045-BLF-SVK, alleging copyright infringement, breach of contract, and violations of California Business & Professions Code § 17200.

164.    BOLD's complaint alleged that Rocket Resume infringed BOLD's copyrights in its "Text Tuner Content" (TTC) database, which BOLD described as containing "original job descriptions" registered with the U.S. Copyright Office.  These claims were almost identical to those brought in the earlier two cases against Resume Companion and Resume Direct.

165.    BOLD sought extraordinary relief including injunctive relief, compensatory damages, punitive damages, exemplary damages, and statutory damages of up to $150,000 per copyrighted work infringed, as well as attorney's fees and costs.  BOLD alleged Rocket Resume infringed the copyright of 750,000 works and sought over $112 billion in damages.

166.    BOLD's copyright claims alleged that Rocket Resume's resume-builder provided job descriptions that included certain common phrases of five words or less, including "hard worker," "good communication," "Microsoft Office," "Google Ads," and other brands, products and industry-standard terminology.  These phrases, however, lack the originality required for

-42-

copyright protection. Short phrases, common expressions, and industry-standard terminology are not copyrightable under established copyright law. BOLD's assertion of copyright protection over such phrases demonstrates the weakness of its claims. Apparently to address these deficiencies, BOLD revised its copyright registration near the end of 2023 while its case was pending against Rocket Resume.

167. With Williams driving the litigation, BOLD filed its lawsuit against Rocket Resume in February 2022, just as Rocket Resume was approaching $10 million in annual revenue and demonstrating strong growth trajectory. BOLD intentionally filed the lawsuit precisely when Rocket Resume's growth threatened to establish it as a significant competitive constraint on BOLD's monopoly power.

168. After BOLD's overtures of an acquisition or settlement to Rocket Resume ultimately proved unsuccessful, BOLD pressed on with its litigation. BOLD's lawsuit forced Rocket Resume to divert substantial financial resources from marketing, product development, and growth initiatives to legal defense. Litigation defense costs for copyright cases of this nature typically range from hundreds of thousands to millions of dollars through trial. And while BOLD's legal claims were weak on the merits, even the remote possibility of a $112 billion judgment against Rocket Resume's founder, Stephen Zimmerman, mandated that Rocket Resume defend itself at all costs.

169. In 2023, Rocket Resume was forced to sharply reduce headcount and marketing spending in order to fund its legal defense. The company suspended all marketing for several months and, as of 2026, has not yet returned to its 2023 marketing levels. Resources that would have been invested in Google Ads and customer acquisition were instead redirected to attorney fees, expert witnesses, and litigation expenses. During this period, Rocket Resume struggled to meet its financial obligations and even considered bankruptcy.

170. The immediate competitive harm was severe and measurable. Rocket Resume's revenue declined significantly in 2024—a 53% collapse directly attributable to reduced marketing spending necessitated by BOLD's litigation. Rocket Resume would never have survived had it not been for its ability to build without salaried employees. Rocket Resume survived because its

-43-

founder was an experienced web developer with some savings who was willing to work without pay—a quality and opportunity that most competitors to BOLD lack.

171.   BOLD's litigation thus achieved its anticompetitive objective even before any ultimate merits determination.  The mere pendency of the lawsuit, with its attendant costs and resource diversion, substantially harmed Rocket Resume's competitive position.

172.   On May 24, 2024, the district court issued an order granting partial summary judgment in favor of Rocket Resume on key issues in BOLD's copyright infringement case.  The court's order was initially filed under seal and publicly released in redacted form on June 5, 2024.

173.   The Court found that BOLD "*failed to supply direct evidence* that Rocket Resume copied its MyPerfectResume website" and "*didn't provide sufficient evidence* showing the two websites had databases with f, that would indicate copying."

174.   The Court's summary judgment order defeated BOLD's compilation infringement theory—BOLD's lead infringement theory.  The court also rejected BOLD's claim for statutory damages, eliminating BOLD's ability to recover the $150,000-per-work damages it had sought, as well as BOLD's claim for attorney's fees.

175.   Following Rocket Resume's summary judgment victory, the Court ordered the parties to mediation, while admonishing BOLD for the weakness of its claims.  BOLD's significant loss at summary judgment confirmed BOLD's copyright claims lacked factual and legal merit and were instead designed to support BOLD's monopolization.

176. Yet BOLD's anticompetitive litigation tactics against Rocket Resume have not ceased. On March 25, 2026, BOLD threatened Rocket Resume with legal action again—this time, for bidding on ads with brand names involving BOLD entities—all without even disclosing the names of those entities that are supposedly forbidden to bid upon. As BOLD knows, bidding upon competitor brand names is industry-standard practice that is greenlit by regulatory agencies, judicial courts, and BOLD itself—BOLD regularly engages in this practice itself. The screenshot below shows Resume-Now, a BOLD brand, appearing in Google Ads results for the search term "rocket resume." BOLD's demand is particularly egregious because BOLD engages in competitive keyword bidding across all of its sham entities through its "double-serving" tactics, yet takes issue with Rocket Resume—a single, legitimate competitor—doing the same. BOLD's attempt to prohibit Rocket Resume from engaging in the very same advertising practices that BOLD routinely employs through its dozens of sham entities stems not from legitimate infringement concern, but is rather the latest phase of an ongoing campaign to anticompetitively drive Rocket Resume out of the Market.



177. BOLD's litigation campaign constitutes additional anticompetitive exclusionary conduct that is causally connected to its anticompetitive auction manipulation. In a but-for world free of BOLD's conduct, Rocket Resume would have fair access to top search positions and would have been stronger, captured more market share, and made more money. But BOLD's litigation

CIVIL COMPLAINT

campaign, brought with anticompetitive intent, constitutes the "backstop" for BOLD if a competitor manages to nonetheless rise up through the ranks and create a serious competitive threat to BOLD's monopoly position.  That is because when a competitor like Rocket Resume is at risk of achieving market traction through superior product quality *despite* BOLD's auction manipulation, BOLD uses litigation, or the specter of litigation, to drain that competitor's resources and prevent further growth.

### D. BOLD HAS CAUSED ANTITRUST INJURY

#### 1. BOLD's Anticompetitive Behavior Has Harmed Customers, Google, and Competitors

178.    BOLD's coordinated anticompetitive conduct has caused antitrust injuries to customers, to Google, and to competitors, including Rocket Resume.

179.    Customers (jobseekers) are harmed by BOLD's deceptive multi-brand strategy, which creates an illusion of competitive choice while denying them alternative options.  Jobseekers looking for online resume-builders believe they are comparing independent options; in reality, they face BOLD, BOLD or BOLD.  This deception, as well as systematic elimination of rivals, is precisely the type of anticompetitive conduct that antitrust law seeks to prevent.

180.    Jobseekers are also stuck with BOLD's low-quality and deceiving offerings.  As detailed above, first, the websites entice customers with "free" resume-builders.  After spending significant time and energy on building their resume, customers have to pay a nominal subscription fee to download the final formatted resume.  The BOLD entities then charge customers a recurring charge of 10-20x this fee every four weeks.  BOLD intentionally makes cancellation difficult.

181.    As one online user states, "I needed a resume on the fly but to use [My Perfect Resume] they have a 2-dollar fee for a couple days that renews close to 23.00 usd.  The problem is they make it really hard to cancel and are almost fraudulent with it. Gonna take it up with my credit card company if they don't refund me."[17]

_____

[17] https://www.reddit.com/r/LifeProTips/comments/vrimuz/lpt_dont_use_my_perfect_resume/?rdt=62326.

-46-

182.     This tracks with other complaints, which describe customers paying $1.85 to $2.95 for a "14-day trial" only to be charged $19.99 to $23.95 every four weeks thereafter, often without adequate notice or clear disclosure at the point of purchase.  These deceptive practices generate revenue from customers who believed they were making one-time purchases, not entering into recurring subscription agreements.  The pattern spans BOLD's entire brand portfolio, indicative of a centralized policy rather than isolated incidents.

183.     Additionally, customers have been harmed by the lack of meaningful innovation and competition, thanks to BOLD's anticompetitive practices.  Instead of innovating, BOLD focuses its resources on driving competitors out of the market and creating sham entities to manipulate customers and critical distribution channels.

184.     Google has also been victimized by BOLD's conduct.  Google's advertising platform, which operates on customer trust, is designed to function as a competitive marketplace—one in which multiple advertisers bid for placement, driving up ad prices and generating revenue for Google.  BOLD's manipulation of that marketplace by deploying ostensibly independent brands that are in fact a single entity undermines Google's competitive Ads space.  Rather than genuine competition among distinct advertisers, Google's auction is populated by BOLD bidding against itself, artificially suppressing the cost-per-click prices that real competition would produce.

185.     Google not only receives less advertising revenue than it would in a properly functioning market, but also faces potential distrust from users of its search platform.  Meanwhile, BOLD captures the benefits of what appears to be a competitive auction while manipulating it to eliminate competition, obtain favorable pricing for sponsored ads, and bolster the efficacy of its organic search.  This is a violation of both Google's policies and the terms and conditions that BOLD agreed to with Google.

186.     BOLD's coordinated anticompetitive conduct—including deception that forecloses the critical distribution channel to competitors—has also created substantial harm to competition in the Market for Online Resume-Building Platforms.  BOLD's conduct has obstructed competitors from using the critical distribution channel that is Google search, and deceiving everyone involved—Google, competitors, and customers alike—about their true operations.

187.    In summary, BOLD's exclusionary scheme ties many actions into a unified, overarching, anticompetitive course of conduct.  At the heart of BOLD's scheme is a complex, sprawling web of sham entities.  BOLD uses these fake entities to rig auctions, engages in price-fixing, deploys predatory over-bidding strategies that independent rivals cannot meet, and weaponizes litigation to further its anticompetitive ends.  Defendants' conduct must be evaluated as a unified scheme rather than as isolated acts.

188.    BOLD's scheme has culminated in this result: transforming the Market for Online Resume-Building Platforms into a monopolized one where BOLD extracts millions of dollars in monopoly profits while jobseekers, search engines, and competitors cannot compete.

189.    Throughout BOLD's lifespan, multiple companies including Rocket Resume have developed innovative technological solutions that could have created a competitive ecosystem with customer choice and price and innovation rivalry.  Yet instead of competing on the merits of their products, Defendants have utilized their anticompetitive scheme to ensure that BOLD captures a dominant market share regardless of product quality, feature innovation, or customer preference.  This is classic monopolization, where a company's success comes from exclusionary conduct that harms competition and rivals rather than its superior performance or lawful marketing strategy.

190.    To this day, BOLD's exclusionary conduct has prevented the development of a competitive Market for online resume-builders.  Defendants' scheme has been so effective that no significant competitor to BOLD's entities has been able to establish a sustainable market presence, despite growing demand for Online Resume-Building Platforms.

191.    Rocket Resume is one of those competitors, and Rocket Resume is a direct victim of BOLD's anticompetitive scheme.  For that reason, Rocket Resume is entitled to damages from BOLD as a result of the harms described herein, alongside appropriate injunctive relief.  But for BOLD's anticompetitive conduct, Rocket Resume would have been able to scale its business.  Instead, Rocket Resume lost out on material business and opportunities to scale, which has led to monetary loss in the hundreds of millions of dollars.

CIVIL COMPLAINT

**2.    Interstate Trade and Commerce**

192.    Rocket Resume re-alleges and incorporates by reference herein all the allegations contained above.

193.    BOLD's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*: (a) BOLD entities have generated and disseminated thousands of resumes that have been used by American jobseekers to apply to jobs in the United States; (b) BOLD has used the instrumentalities of interstate commerce to advertise throughout the United States; (c) In furtherance of the anticompetitive scheme alleged herein, BOLD employees have traveled between states and have exchanged communications through interstate wire communications and via United States mail; and (d) the anticompetitive scheme alleged herein has affected millions of dollars of commerce in the United States.

## CAUSES OF ACTION

## COUNT I

**Sherman Act Section 2 – Monopolization (15 U.S.C. § 2)**

194.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

195.    BOLD has willfully acquired and maintained monopoly power in the national Market for Online Resume-Building Platforms.

196.    BOLD possesses monopoly power in the Market for Online Resume-Building Platforms.  BOLD has the power to control prices or exclude competition in the Market for Online Resume-Building Platforms.

197.    BOLD has a dominant market share in the Market for Online Resume-Building Platforms, and there are substantial barriers to new entry.

198.    BOLD has acquired, and now maintains, monopoly power in the Market for Online Resume-Building Platforms through the conduct described above including, but not limited to, de facto exclusive dealing, predatory overbidding, and a sham litigation campaign.

199.    BOLD's conduct has had a substantial effect on interstate commerce.

-49-

200.    Defendants Jackson, Freundlich, and Williams are personally liable for BOLD's monopolization of the Market.  As Co-Chief Executive Officers of BOLD, Jackson and Freundlich personally directed, authorized, and participated in the anticompetitive scheme described herein, including the construction of the sham entity network, the coordinated bidding strategy across ostensibly independent brands, and the anticompetitive litigation campaign against competitors. Jackson and Freundlich were not passive corporate officers — they founded the enterprise, launched the initial litigation campaign against competitors in 2014, and, together with Williams, have personally overseen BOLD's anticompetitive scheme from its inception.  They have also each personally profited from BOLD's anticompetitive scheme.

## COUNT II

### Sherman Act Section 2 – Attempted Monopolization

201.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

202.    To the extent BOLD does not already possess monopoly power in the Market for Online Resume-Building Platforms, BOLD has attempted to monopolize that Market through the anticompetitive conduct described herein, including constructing a sprawling web of sham entities to foreclose the Market's critical distribution channel, engaging in predatory overbidding, and weaponizing sham litigation against emerging competitors.

203.    BOLD has engaged in this conduct with the specific intent to monopolize the Market for Online Resume-Building Platforms.  BOLD's intent is demonstrated by, among other things, its deliberate construction of sham entities designed to create the illusion of competition while foreclosing actual rivals; its systematic campaign of sham litigation timed to coincide with competitors' growth inflection points; and its pattern of acquiring or destroying every competitor that achieves meaningful market traction — conduct that serves no legitimate business purpose other than eliminating competition.

204.    There is a dangerous probability that BOLD will achieve monopoly power in the Market for Online Resume-Building Platforms if its conduct is not enjoined.  BOLD already controls an estimated 80-90% of the Market.  Rocket Resume — BOLD's largest remaining independent

-50-

competitor — holds a market share in the single digits and has seen its revenue decline by 53% as a direct result of BOLD's anticompetitive conduct. No other significant independent competitor remains. BOLD continues to acquire emerging rivals and to foreclose the only viable distribution channel in the Market. Absent judicial intervention, BOLD's monopolization of the Market is not merely probable—it is imminent.

205. BOLD's conduct has had a substantial effect on interstate commerce.

206. Defendants Jackson, Freundlich, and Williams are personally liable for BOLD's attempted monopolization of the Market. Defendants Jackson, Freundlich, and Williams personally conceived, directed, and executed the anticompetitive scheme described herein. Their specific intent to monopolize is evidenced by their direct and continuous involvement in constructing BOLD's network of sham entities, orchestrating coordinated bidding across those entities, and personally overseeing the litigation campaign designed to neutralize or absorb every significant competitor in the Market.

## COUNT III

### Sherman Act Section 1 – Conspiracy to Restrain Trade

207. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

208. Defendants and the various sham entities described herein, including at least Sonaga Tech, NOW Limited, BOLD LLC, and BOLD Limited, have engaged in a combination and conspiracy in restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

209. These conspirators have created a complex web of sham entities around the globe that have conspired to create the illusion of competition for customers, industry observers, and regulators worldwide.

210. This scheme allows Defendants to dominate and foreclose critical marketing channels from rivals, including by engaging in auction manipulation, bid-rigging, and price-fixing in channels dependent upon paid advertising, including Google search.

211. This coordinated bidding among ostensibly competing entities constitutes per se unlawful bid rigging and price fixing, or, in the alternative, constitutes an unreasonable restraint of trade.

212. The scheme also allows Defendants to engage in a kind of price-fixing through deceptive pricing strategies. In a competitive market, any single Defendant attempting to deceive customers through "free" services that later result in surprise charges would quickly go out of business. BOLD's sham entities are allowed to jointly continue this strategy only through an illegal horizontal agreement among competitors (to the extent the "entities" are separate competitors).

213. Defendants' conspiracy has also led to anticompetitive effects in the Market for Online Resume-Building Platforms, including supracompetitive prices, reduced output, and reduced product quality.

214. As a direct, material, and proximate result of Defendants' violations of §1 of the Sherman Act, Rocket Resume has suffered injury to its businesses and property, within the meaning of §4 of the Clayton Act. Rocket Resume is entitled to treble damages for Defendants' violations of §1 of the Sherman Act under § 4 of the Clayton Act.

215. Defendants' conduct has had a substantial effect on interstate commerce.

216. Defendants Jackson, Freundlich, and Williams personally orchestrated and directed the conspiracy among the sham entities described herein. As the individuals who control BOLD and its network of ostensibly independent entities, Jackson, Freundlich, and Williams coordinated the bidding strategies, pricing decisions, and marketing activities across Sonaga Tech, NOW Limited, BOLD LLC, BOLD Limited, and other sham entities, thereby effectuating the conspiracy to restrain trade in the Relevant Market.

**COUNT IV**

**Unfair Competition – California Business & Professions Code § 17200 *et seq.***

217. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

-52-

CIVIL COMPLAINT

218.    Absent injunctive relief, Rocket Resume will continue to suffer loss of money or property and an economic injury in fact, specifically being unable to lawfully compete in the relevant Market, and thus has standing to seek relief under section 17200.

219.    BOLD's actions establish a claim of unlawful competition on multiple grounds. BOLD's anticompetitive and tortious conduct gives rise to a claim under the "unlawful" business practices prong of the UCL.

220.    Similarly, BOLD's anticompetitive conduct gives rise to a claim under the "unfair" business practices prong of the UCL.

221.    As a direct and proximate result of BOLD's conduct, Rocket Resume has suffered and will continue to suffer damages.

222.    By reason of the foregoing, BOLD has engaged in unfair competition, including unlawful, unfair, deceptive and fraudulent business acts or practices, in violation of California Business & Professions Code § 17200, *et seq.*

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff requests the following relief:

(a)    Damages in an amount to be determined;

(b)    Treble damages;

(c)    Attorneys' fees;

(d)    Costs;

(e)    Pre-judgment and post-judgment interest at the maximum rate permitted under the law;

(f)    Punitive damages;

(g)    Injunctive relief;

(h)    Declaratory relief, including but not limited to a declaration and judgment that BOLD's conduct alleged in the Complaint violates the laws alleged in the Complaint; and

(j)    Such other and further relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATED: April 2, 2026                     QUINN EMANUEL URQUHART & SULLIVAN, LLP


By   */s/ Sam S. Stake*

Sam S. Stake (Cal. Bar No. 257916)
samstake@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600

David LeRay (*pro hac vice* forthcoming)
davidleray@quinnemanuel.com
Scott Hartman (*pro hac vice* forthcoming)
scotthartman@quinnemanuel.com
Steig D. Olson (*pro hac vice* forthcoming)
steigolson@quinnemanuel.com

295 Fifth Avenue, 9th Floor
New York, New York 10016
Telephone: (212) 849-7000

*Attorneys for Rocket Resume*

-54-